

# Human Factors Analysis

| | |
|---|---|
| Prepared by: | Steve Arndt, PhD, CHFP |
| Prepared for: | John Sigety |
| Project Number: | 32-5600 |
| Project Name: | Shanafelt-Wesley v. Stanley Access Technologies |
| Date: | February 5, 2021 |

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

## Table of Contents

TABLE OF FIGURES ........................................................................................................ 3

EXECUTIVE SUMMARY ................................................................................................ 5

BACKGROUND ............................................................................................................... 6

OPINIONS AND BASES ............................................................................................... 17

    OPINION 1 ................................................................................................................. 17

    OPINION 2 ................................................................................................................. 20

    REVIEW OF REPORT FROM MS. JOELLEN GILL ......................................................... 29

DEMONSTRATIVE EXHIBITS FOR DEPOSITION AND TRIAL .......................................... 30

DOCUMENTS REVIEWED ........................................................................................... 30

REFERENCES ............................................................................................................... 31

LIST OF CLIENT SUPPLIED MATERIALS ...................................................................... 34



## Table of Figures

Figure 1 Google Earth image of Walmart with yellow box around incident location. ..........................................................................................................6

Figure 2 Photograph of outside of entrance showing exterior security camera, adapted from DHPC002124. ...........................................................................7

Figure 3 Image of location of interior security camera taken as a screen capture from shared deposition exhibit number 5 [STANLEY 00140]..................................7

Figure 4 Video frame from interior security camera showing location of drop-off. ...........................................................................................................8

Figure 5 Google Earth image of incident Walmart entrance area with the approximate path taken by Ms. Shanafelt-Wesley shown by the dashed yellow line................................................................................................................9

Figure 6 Video frame taken from exterior security camera showing Ms. Shanafelt-Wesley was positioned across the threshold prior to the door closing and contacting her.........................................................................................10

Figure 7 Video frame from interior camera showing approximate time of Ms. Shanafelt-Wesley beginning to walk towards the entrance. ...................................10

Figure 8 Video frame from interior camera showing position of Ms. Shanafelt-Wesley immediately before when the doors open for the first time during her approach. ................................................................................................11

Figure 9 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as first patron enters the store in front of her after doors have opened. .12

Figure 10 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as second patron enters the store in front of her. ....................................12

Figure 11 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors begin to close in front of her and behind second patron. ..........13

Figure 12 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors stop closing and begin to open. ...................................................13

Figure 13 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors begin to close again in front of her as she is reaching out for the door frame. ..............................................................................................14

Figure 14 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors stop closing and begin to open. .................................................14

Figure 15 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors reach the fully open position.......................................................15

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

Figure 16 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as she steps onto the threshold...............................................................15
Figure 17 Video frame from interior camera showing position of Ms. Shanafelt-Wesley at the first frame where closing movement of the door was observable.16
Figure 18 Excerpt from Stanley Owner's manual. [STANLEY 00002] ...................21
Figure 19 Excerpt from Stanley Owner's manual. [STANLEY 00003] ...................22
Figure 20 Excerpt from Stanley Owner's manual. [STANLEY 00004] ...................23
Figure 21 Excerpt from Stanley Owner's manual. [STANLEY 00006] ...................24
Figure 22 Daily Safety Check. [STANLEY 00012] ...................................................25
Figure 22 Excerpt from Stanley Owner's manual. [STANLEY 00007] ...................27
Figure 23 Excerpt from Stanley Owner's manual. [STANLEY 00009] ...................28



Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

## Executive Summary

I, Steven R. Arndt, hold the following opinions to a reasonable degree of scientific certainty at the time of the issuance of this report. These opinions are based on my review of the supplied materials, my review of relevant standards and literature, my review of inspection videos and photographs, my education, training, and experience. The basis for each opinion is described in detail in the body of the report. Where direct citations are provided in footnotes, they are not necessarily my sole basis for the associated statements and in many cases there is additional supporting testimony that is not included in the footnotes.

1. No additional or alternative warning labels on the doors or different location of the labels from Stanley Access Technologies LLC were necessary nor would have prevented this incident. The root cause of this incident was failure to maintain and verify the operation of the door in a reasonably safe condition, not anything related to warning labels.
2. Additions or alterations to the originally supplied Owner's manual would not have altered the behaviors of individuals in a position to prevent this incident.

I understand that discovery is not complete and I reserve the right to amend or supplement these opinions if additional work is requested and/or additional discovery materials are provided.

Sincerely,

Steven R. Arndt, Ph.D., CHFP

Principal



Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

## Background

On November 13, 2019 Ms. Sharon Shanafelt-Wesley, (DOB 11/14/45), was dropped off by her granddaughter Stephanie Shanafelt[1], at the entrance of the Walmart store located at 1410 E Main St, Eastland, TX. The layout of the store parking lot and entrance are shown in Figure 1.



**Figure 1 Google Earth image of Walmart with yellow box around incident location.**

At the front of the store at the incident location was a Stanley Access Technologies LLC [Stanley] Duraglide 3000 door. The door system had been modified by an entity other than Stanley at some point after their service contract ended in 2013. Two security cameras at the store captured the movements of Ms. Shanafelt-Wesley from the time she exited the car through the time she fell.

---

[1] Sharon Shanafelt-Wesley deposition, 8/27/20, p. 26



Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

One security camera was outside the building and one in the vestibule. (Figure 2 and Figure 3)



**Figure 2 Photograph of outside of entrance showing exterior security camera, adapted from DHPC002124.**



**Figure 3 Image of location of interior security camera taken as a screen capture from shared deposition exhibit number 5 [STANLEY 00140].**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

The interior camera shows Ms. Shanafelt-Wesley is dropped off at the entrance, exits the passenger side of her vehicle and makes her way towards the store entrance. The front wheel of her vehicle is aligned approximately at the Eastern most portion of the fixed panel of the doorway. (Figure 4)



**Figure 4 Video frame from interior security camera showing location of drop-off.**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



**Figure 5 Google Earth image of incident Walmart entrance area with the approximate path taken by Ms. Shanafelt-Wesley shown by the dashed yellow line.**

The approximate path from the car to the doorway is shown by the dashed yellow line in Figure 5.

The exterior camera provides a view looking along the building and allows for the assessment of Ms. Shanafelt-Wesley's depth of penetration into the door threshold at the time she is contacted by the closing door. (Figure 6)


Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



**Figure 6 Video frame taken from exterior security camera showing Ms. Shanafelt-Wesley was positioned across the threshold prior to the door closing and contacting her.**



**Figure 7 Video frame from interior camera showing approximate time of Ms. Shanafelt-Wesley beginning to walk towards the entrance.**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

Using the interior security camera, an approximate time for Ms. Shanafelt-Wesley to have begun to walk to towards the entrance was determined to be about 1:35:48 (Figure 7).

During the first 12 seconds of Ms. Shanafelt-Wesley's walk towards the entrance she covers a little more than half the distance. During this period the doors remain closed. At 1:36:00 it appears that another store patron approaches the entrance from the west, triggering the doors to open, her position is shown in Figure 8.

The remaining distance to the door threshold is covered by Ms. Shanafelt-Wesley in 19 seconds. During that time two patrons enter the store in front of her. The doors begin to close in front her then reopen, then she makes contact with the fixed portion of the door and the door begins to close again, and then reopen when she steps into the door opening and stops on the threshold apparently bracing herself against the movable panel of the door. Ms. Shanafelt-Wesley's location for change in direction of the door are shown in Figure 8 - Figure 17.



**Figure 8 Video frame from interior camera showing position of Ms. Shanafelt-Wesley immediately before when the doors open for the first time during her approach.**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



**Figure 9 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as first patron enters the store in front of her after doors have opened.**



**Figure 10 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as second patron enters the store in front of her.**



Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



**Figure 11 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors begin to close in front of her and behind second patron.**



**Figure 12 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors stop closing and begin to open.**


Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



**Figure 13 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors begin to close again in front of her as she is reaching out for the door frame.**



**Figure 14 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors stop closing and begin to open.**



Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



**Figure 15 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as doors reach the fully open position.**



**Figure 16 Video frame from interior camera showing position of Ms. Shanafelt-Wesley as she steps onto the threshold.**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021





**Figure 17 Video frame from interior camera showing position of Ms. Shanafelt-Wesley at the first frame where closing movement of the door was observable.**

The combination of the unexpected movement of the door and the fact that Ms. Shanafelt-Wesley is bracing against the door when it begins to move causes an immediate transfer of energy from the door into Ms. Shanafelt-Wesley. There are several factors that create a situation that Ms. Shanafelt-Wesley apparently cannot recover from. She has just begun to lift her right foot from the ground, she has a narrow stance, was directly in contact with the door and also appeared to have some mobility and balance difficulties as evidenced by her travel from the car to the door.

Ms. Shanafelt-Wesley was using the doorway in a reasonably foreseeable manner and for its intended purpose.

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

## Opinions and Bases

### Opinion 1

**No additional or alternative warning labels on the doors or different location of the labels from Stanley Access Technologies LLC were necessary, nor would have prevented this incident. The root cause of this incident was failure to maintain and verify the operation of the door in a reasonably safe condition and not related to warning labels.**

Over the past forty years, a sizable literature on behavioral responses to risk communications has developed.[2] Key factors considered in the scientific literature include:

- The likely effectiveness of providing a warning about a particular hazard.[3]

- Labeling directives presented in relevant standards and guidelines.[4]

- Relationships between the number of warnings presented and attention and memory.[5]

- The likely effect of formatting and the inclusion of specific warning elements on compliance.[6]

- And, the selection of hazards about which to warn based on the highest potential impact concerning:

    - Injury counts

    - Risk analysis

    - Accident mode analysis[7]

    - And, individuals' acceptance of communication and motivation to alter behavior.[8]

---

[2] McCarthy et al., 1984, Ayres et al., 1989, 1998; Miller & Lehto, 2001; DeJoy et al., 2006.

[3] e.g., Ayres et al., 1989; Arndt et al., 1998; Dorris & Purswell, 1977.

[4] e.g., Sala et al., 2010; Wood et al., 2006; Diedrich et al., 2001.

[5] e.g., Chen et al., 1997; Dorris, 1991; Frantz et al., 1999.

[6] e.g., Young et al., 2002.

[7] e.g., McCarthy et al. 1995; Ayres & Wood, 1995.

[8] e.g., Ayres et al., 1989; Wogalter et al., 1989.

In particular, user factors such as one's motivation to search for warnings information, prior experience and familiarity with a product or activity, and the "costs" to the person who is reading the warning (in terms of money, convenience, time, energy, etc.), associated with the hazard mitigation measures have been shown to influence warnings compliance.[9] Assertions of injury due to a lack of warnings presume that product users are ignorant of the potential hazards of using products in particular ways, and/or that the mere act of making safety information available to users will induce them to modify their behavior and thereby reduce the frequency of injuries. However, the results of the accumulating research demonstrate the difficulty of changing product use behavior and improving safety via warnings. For example, often a user presumably already knows (or thinks he/she knows) the hazards and rules for use, so warnings tend not to be sought out, read, and heeded.[10] Any explicit statement of the already familiar risks would appear redundant from the user's perspective.

Scientific literature in the field of human factors does not support that post-incident, self-reported compliance is an accurate predictor of warnings compliance. Previous studies have shown that once people have knowledge of an outcome, they tend to view the outcome as having been more probable than other possible outcomes.[11] Moreover, people tend to be largely unaware of the modifying effect of outcome information on what they believe they could have known in foresight.[12] These two tendencies collectively have been termed as hindsight bias.

Literature indicates that people are likely to comply with warnings or instructions only if the cost (in terms of money, convenience, time, energy, etc.) is low enough for the individual to believe compliance is worthwhile. When the cost increases, even if only slightly, the rate of compliance drops significantly.[13] Given the numerous factors shown to reduce compliance, it is perhaps unsurprising that Ayres et al. (1998) found that of twenty-one real-world observational studies

---

[9] e.g., Ayres et al., 1989; Karnes et al., 1986; Otsubo, 1988; Dingus et al., 1991; Khan et al., 2013.
[10] e.g., Dorris & Purswell, 1977; Otsubo, 1988; Zeitlin, 1994.
[11] Woods et al., 2010.
[12] Ibid.
[13] e.g. Dingus et al., 1991; Wogalter et al., 1987.

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

reviewed, none reported substantial and unequivocal positive behavior changes associated with warning labels or signs; "most found no positive change whatsoever" (p. 200). Individuals may notice the presence of a warning but still not stop to examine it.[14] The literature suggests that the majority of people fail to notice, fail to read, and/or ignore warnings on products.[15]

In this case, there is a claim that there were insufficient warnings on the door to inform Ms. Shanafelt-Wesley that the door could close unexpectedly or without warning. If one were to ignore all of Ms. Shanafelt-Wesley previous experience with power operated doors, ignoring the 100's of times her granddaughter said they were at this store[16], which would be scientifically inappropriate, and only focus on this one instance, during her more than 30 seconds of travel from her car to standing in the threshold of the doorway, the door initiates a closing movement three times with no indication or warning that it is about to move. Two of the closings occur when she is within arm's reach of the door. At this distance it would be impossible for any reasonably alert and attentive individual to not witness the movement of the door. It is unreasonable to conclude that Ms. Shanafelt-Wesley did not understand the operation of this door when it was functioning properly. Given her past experience with this store[17] and the immediately prior experience of the door starting movement while was within arm's reach any reasonably alert and attentive individual would know that the motion of the door is not preceded by any type of warning signal.

Even if we presume that Ms. Shanafelt-Wesley has never seen the Stanley warning at the bottom of the door during any prior visit or at any other location with automatic doors, the label was visible to her during the first half of her walk towards the door. Furthermore, as she reaches out to grab ahold of the door frame the majority of the label is visible. There is no credible scientific basis that would support an opinion that Ms. Shanafelt-Wesley was not aware that the door was automatic and that the door would initiate movement without any form of a warning. As such the information in the warning label at the bottom of the door

---

[14] Black et al., 2017.

[15] e.g., Goldhaber & DeTurck, 1988; Otsubo, 1988; McGrath, 1994.

[16] Stephanie Shanafelt deposition, 7/16/20, p. 35

[17] Sharon Shanafelt-Wesley deposition,  8/27/20, pp. 22, 25;  Stephanie Shanafelt deposition, 7/16/20, p. 35

provided her with no information that she would not have already had. Therefore the fact that it was placed on the moving portion of the door was immaterial to this incident. The fact that it was not placed at a different location is also immaterial to this incident.

However, the warning label and the expected knowledge of users of automatic doors both presume that the door will be functioning properly and will not initiate a closing motion while there is a user in the doors path. It is reasonable for a user of an automatic door to believe that the door will not close on them while they are in the path of the door if it is functioning properly. It is also reasonable for manufacturers of doors that are properly installed and maintained and verified to have met industry standards as well as their own owner's manuals requirements to not close on a user who is within the threshold of the door.

There would be no credible scientific reason for a manufacturer of automatic doors to write their warning labels presuming that the door would not be maintained properly and would be in regular service without proper sensors functioning.

## Opinion 2

**Additions or alterations to the originally supplied Owner's manual would not have altered the behaviors of individuals in a position to prevent this incident**

According to testimony from Walmart employees, the Stanley Owner's manual was not reviewed or used as a reference by Walmart employees at the incident location for any reason. The daily checklist provided in the manual, if read and followed, would likely have allowed Walmart to identify the faulty door operation prior to the incident if it was not functioning prior to the date of the incident. The manual repeatedly informs the owner that they should use the daily check list. (Figure 18 -Figure 22)

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



# ⚠ CAUTION

**Improperly Adjusted Door** can cause injury and equipment damage.

Inspect door operation daily using safety checklist in Owner's Manual and at door.

Safety devices should be in place and operational.

Have door adjusted as recommended in Owner's Manual if necessary.

Have door inspected at least annually by a Stanley trained technician.

In the following manual,
- the word **Caution** means that injury or property damage can result from failure to follow instructions.
- the word **Note** is used to indicate important steps to be followed or important differences in equipment.

203918

Page 2

CONFIDENTIAL

STANLEY 00002

**Figure 18 Excerpt from Stanley Owner's manual. [STANLEY 00002]**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

*To Our Customers:*

The purpose of this manual is to familiarize you with your automatic door system. It is essential that you "know your system", how it operates, and that you recognize the importance of maintaining your door system in compliance with the industry standards for safety.

<u>It is your responsibility</u>, as owner or caretaker of the equipment, to inspect the operation of your door system on a daily basis to insure that it is safe for all users of the door.

This manual will provide you with a description of the operation and maintenance requirements of your door system. It also provides the instructions for the "Daily Safety Check" procedure. It is recommended by Stanley that the "Daily Safety Check" be performed at least once a day and after any power outage. Occasional observance of the doors as they are in use is also recommended.

Should the door fail to operate as prescribed in the "Daily Safety Check", or at any other time for any reason, <u>do not attempt to repair or adjust the door</u>. Discontinue operation of the door and call for service by a Stanley-trained service technician. These technicians are trained to service your door in accordance with applicable industry safety standards.

*Service Availability:*

Stanley Access Technologies products are distributed through a nationwide network of authorized distributors that specialize in Sales, Installation and Service of automatic door systems. Our Service Programs offer you ongoing support such as regularly scheduled preventive maintenance, or if required, emergency service 24 hours a day, 365 days a year. No matter where you are located, our technicians are just a phone call away. Should you need service on your door system, call Stanley Access Technologies *toll free* at 1-888-DOOR-444.

*Limited Warranty:*

Stanley Access Technologies, a Division of The Stanley Works, warrants the installed door system against failure due to manufacture of substandard material or workmanship for one year beginning on the completed date of installation. Please review your Certificate of Warranty Agreement for your full Warranty.

*Compliance with Industry Standards:*

Your door system was designed to the latest operating and safety standards as prescribed by ANSI A156.10 and Underwriters UL325 requirements. It is important that:
- Your door system be maintained in compliance with the standards of the industry.
- Proper decals and labels be applied and maintained on your doors. If decals have been removed or cannot be read, request that the labels be replaced when calling for service.
- Safety devices be checked by a trained technician annually and each time a door is serviced.

203918

Page 3

CONFIDENTIAL

STANLEY 00003

**Figure 19 Excerpt from Stanley Owner's manual. [STANLEY 00003]**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

## Functional Description

Few things you do for your business convey the effortless sense of service and convenience of a Dura-Glide sliding door system. It provides the ultimate in accessibility by invisibly sensing each approach and silently sliding open to create an inviting opening and a gracious exit from any location.

The Dura-Glide 2000 and 3000 Series have become the standard for smooth, reliable service for high pedestrian traffic locations. The Dura-Glide 5000's telescoping design gives you a wider clear opening than standard two-panel doors without increasing the overall size of the door frame. The IS10000 provides a clear opening for not only pedestrian traffic but material handling equipment such as tow motors, etc. All Dura-Glide door systems combine over 60 years of proven Stanley performance with an advanced microprocessor design to deliver the most trouble free operation available.

Dura-Glide 2000, 3000 and 5000 Series door systems come standard with our SU-050 microwave motion sensor and our Stanguard® infrared threshold sensor. The motion sensor mounts over the door and activates the operator to open if it detects oncoming traffic. The Stanguard® threshold sensor monitors the threshold area and prevents door closing if it senses a person or object in the doorway. The Model IS10000 comes standard with our SU-050 motion sensor and two doorway holding beams to prevent the door from closing on pedestrian or material handling traffic.

Other activating alternatives used are mats, wall plates, radio controls, jamb-mounted push buttons, key switches, keyless entry pads or card readers.

You get complete safety protection with all Dura-Glide door systems. In addition to our microwave and infrared sensors, the microprocessor controller contributes to safety with its built-in logic function that reverses door operation in the unlikely event an obstacle prevents the door from closing.

Stanley Dura-Glide sliding doors eliminate the position switches that cause 30-40% of all service problems in other doors. Our motor encoder does the job electronically, monitoring door position at every point in the opening and closing cycle for increased control with fewer moving parts. The doors are driven by a toothed timing belt and pulley system which prevents slippage and ensures smooth, consistent door motion time after time.

An automatic door is a complicated assembly of mechanical, electrical and electronic components that make up a system that you depend on to provide convenience and safety to all users. Lack of maintenance on your door equipment can have significant implications on the cost of ownership. Stanley's total service and properly scheduled maintenance will extend the life of your equipment and keep it performing to its full potential.

203918                                                                                         Page 4

CONFIDENTIAL                                                                      STANLEY 00004

**Figure 20 Excerpt from Stanley Owner's manual. [STANLEY 00004]**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

## Daily Maintenance

### Housekeeping:

General housekeeping maintenance should be provided by the owner or responsible person in charge. Check the door area for tripping or slipping hazards. There should be no bulletin boards, literature racks, merchandise displays, or other attractions in the door area where people could be hit by the door. The track assembly must be maintained free of debris. It is recommended that any debris in the door track be vacuumed out.



Check all door panels for broken or cracked glass. Panels should be made of a safety type material. The door glass can be cleaned with commercial glass cleaners. Clean the lenses of the sensors with a dampened cloth. Do not spray cleaners directly at the lens.

Inspect the door(s) to make sure the decals are properly displayed. See diagram on page 7.

### Daily Safety Check:

- A 'Daily Safety Check' of the doors should be completed at a minimum of once a day. Please see the attached 'Daily Safety Check' list for procedures.
- Should you need a demonstration on the Daily Safety Check of doors, ask your Stanley technician at the next service call or contact your local Stanley office or distributor and request a Daily Safety Check Video Tape for Automatic Doors.

Note: Stanley recommends a semi-annual inspection / adjustment of your automatic door equipment to optimize its performance and to extend the life-time of your purchase.

203916                                                                           Page 6

CONFIDENTIAL                                              STANLEY 00006

**Figure 21 Excerpt from Stanley Owner's manual. [STANLEY 00006]**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



**Figure 22 Daily Safety Check. [STANLEY 00012]**

Additionally the Owner's manuals provide information about how the door functions, troubleshooting and also information about the labeling that should be present on the doors. (Figure 23 and Figure 24) Testimony production materials indicate that Walmart had engaged the services of DH Pace to maintain their automatic door systems in 2013. Walmart did not perform any service or maintenance on the doors themselves. However, the testimony does demonstrate that Walmart employees recognized that they would be the entity that should be performing the daily inspections of the doors.

As the manuals were not referenced or used at this location, any alterations or additions to the manual would not have provided any information to the users of the doors at this location.

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021



**Figure 23 Excerpt from Stanley Owner's manual. [STANLEY 00007]**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

This would not be considered an emergency.
Is there an obstruction: a) in the floor track? in the path of the door? in the path of the sensors? This may include a threshold sensor or a doorway holding beam. Does door(s) manually slide open and closed? If not and customer cannot find obstruction, recommend a service call.

**PROBLEM:** Door(s) open and stay open OR start to close and re-open (recycle).
**ACTION:** Check for anything new in doorway area (inside and outside) and near the threshold sensor. This would include throw rugs, mats, loose signs taped to door(s), benches, ash trays, garbage cans, magazine racks, trash, newly waxed floor, or any change in the environment.

Door(s) may need to be reset. This is done by turning the power switch to the 'OFF' position ('AUT/CLS/OPN' switch to 'AUT'; 'RO' switch to 'NO'; 'ENTER' switch does not matter). Wait a few seconds, turn back 'ON' and allow door to re-tune itself. The door(s) will open and close very slowly in a search mode and, if possible, should not be interrupted during this process. If traffic must go through, door(s) will open at regular speed then when zone is clear, door(s) will close at regular speed until they reach a point of interruption then resume search mode (slow speed) until closed.

**PROBLEM:** Door(s) stays fully open and does not close.
**ACTION:** Turn power off. The door(s) should close after a time delay. This action will reset the sensors and allow the Stanguard to automatically retune itself.

**PROBLEM:** Door(s) should open and close normally when approached and should not attempt to close until the area is clear. This should be tested from both sides for two-way traffic.
**ACTION:** If door(s) does not work properly at this time, customer should turn door(s) off and a service call should be scheduled.

**PROBLEM:** Door(s) opens too soon or too late.
**ACTION:** Sensor zones are not properly angled and adjusted. This problem requires service from a qualified maintenance person.

**PROBLEM:** Door slams at full open or full close.
**ACTION:** This problem requires service from a qualified maintenance person.

203918

Page 9

CONFIDENTIAL

STANLEY 00009

**Figure 24 Excerpt from Stanley Owner's manual. [STANLEY 00009]**

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

## Review of report from Ms. Joellen Gill

I have reviewed the report from Ms. Gill dated November 9, 2020. As she has not been deposed I can only comment on the content of her report. I may have additional analysis after her deposition is taken.

I disagree with her opinion 3. In her first numbered paragraph she states that the reason for the label on the door is that Stanley knew that a door could close on a patron standing in the threshold. She provides no basis for this opinion. The first line of the label is the recommended content from the ANSI A156.10 standard. The last line of the label does not indicate that it predicts a situation such as this incident. The label only indicates that the door will begin the closing motion without any type of warning before movement. There is no pre-signal to movement. It is clear from the testimony, the design as built and the industry standards, that a properly adjusted and functioning door will not close on someone standing in the threshold but it will absolutely begin the closing motion without any warning, every single time it closes.

In the second through fifth numbered points she refers to a hierarchical process for design. She states that Stanley relied on the warning label to provide a reasonably safe product. It appears that she has ignored all of the design elements present in the door as specified by the ANSI standards that limit the speed and force of the door's movements, the timing of the movements of the door and all of the sensors that were installed on the door. Powered automatic doors provide an improvement in safety and convenience over manual operation doors. A door that is designed to meet ANSI standards, installed properly and properly maintained utilizes all of what Ms. Gill identifies as more effective levels of safety and does not rely on the warning labels for the reasonably safe use of the door.

With regard to her numbered point six, it is clear that the doors were closed as Ms. Shanafelt-Wesley approached them. Further, she fails to even consider if the labeling had been seen by Ms. Shanafelt-Wesley during a previous trip to this location. The labeling is present on the inside of the doors also. More importantly, as discussed above, the ability to read this label would not have altered the outcome of the incident.

In numbered point seven she makes reference to aspects of visual field and visual acuity and peripheral vision. All of this is irrelevant as has been described

above when talking about the detection of the labeling. Furthermore, Ms. Gill has not shown any analysis that demonstrates the information on the label is not readable as a user approaches the door and enters the store.

In point eight she references changes to the manual. I have covered this opinion earlier in the report. Testimony indicates that Walmart employees did not read or follow any of the information in the supplied manual, there is no basis for her to conclude that a different manual or a manual with different content would be read and followed.

In Ms. Gill's opinion four, in the sixth numbered point, it is not possible in the videos I have seen to determine where Ms. Shanafelt-Wesley's eyes were during her approach to the doorway. At best you can see her head position. The human's eyes can move through a very large range without movement of the head. There is insufficient data for Ms. Gill to reliably determine where specifically Ms. Shanafelt-Wesley was looking.

## Demonstrative Exhibits for Deposition and Trial

At this time, I have not completed preparation of final exhibits for deposition or trial. If needed, I expect that the exhibits may include, but not be limited to, my report and the materials listed in the body and/or provided in the attached appendices, excerpted sections from any relevant standards, photographs or blueprints of the product, available manuals, labels and/or instructions, and results from my analysis described above. Additional demonstrative exhibits may be prepared when necessary to adequately illustrate and explain the technical details of the analysis, findings, or opinions to the jury.

My bill rate at the time of issuance of this report is $400/hour for all non-testimony work. Testimony is charged at $550/hour. A copy of my current curriculum vitae is attached.

## Documents Reviewed

As part of my analysis, I have reviewed and relied upon materials provided to me in this case, listed in a following section, and on materials cited within this report and listed in the references section. Where depositions or reports were provided

with attachments or exhibits, those documents were also reviewed, even if not individually listed.

As discovery is continuing, additional materials may be generated and further analysis may be conducted. If additional opinions or alterations to the opinions stated in this report are generated, those opinions will be communicated to Mr. John Sigety.

## References

Arndt, S. R., Ayres, T. J., McCarthy, R. L., Schmidt, R. A., Wood, C. T., & Young, D. E. (1998). *Warning labels and accident data*. Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 42nd Annual Meeting.

Ayres, T. J., & Wood, C. T. (1995). The Warning Label Development Process. *Proceedings of the Silicon Valley Ergonomics Conference & Exposition*.

Ayres, T. J., Gross, M. M., Wood, C. T., Horst, D. P., Beyer, R. R., & Robinson, J. N. (1989). *What is a warning and when will it work?* Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 33rd Annual Meeting.

Ayres, T. J., Wood, C. T., Schmidt, R. A., Young, D. E., & Murray, J. (1998). *Effectiveness of warning labels and signs: An update on compliance research*. Paper presented at the Proceedings of the Silicon Valley Ergonomics Conference & Exposition (ErgoCon '98).

Black, A., Luna, P., Lund, O., & Walker, S. (Eds.). (2017). Information design: research and practice. Taylor & Francis.

Chen, J. Y. C., Gilson, R. D., & Mouloua, M. (1997). *Perceived risk dilution with multiple warnings*. Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 41st Annual Meeting.

DeJoy, D. M., Cameron, K. A., & Della, L. J. (2006). Postexposure Evaluation of Warning Effectiveness: A Review of Field Studies and Population-Based Research. In M. S. Wogalter (Ed.), *Handbook of Warnings*: Lawrence Erlbaum Associates.

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

Diedrich, F. J., Wood, C. T., & Ayres, T. J. (2001). *Trends in federally mandated warning labels for consumer products*. Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 45th Annual Meeting.

Dingus, T. A., Hathaway, J. A., & Hunn, B. P. (1991). A most critical warning variable: Two demonstrations of the powerful effects of cost on warning compliance. Proceedings of the Human Factors and Ergonomics Society 35th Annual Meeting, 1034-1038.

Dorris, A. L. (1991). *Product warnings in theory and practice: Some questions answered and some answers questioned*. Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 35th Annual Meeting.

Dorris, A. L., & Purswell, J. L. (1977). Warnings and human behavior: Implications for the design of product warnings. *Journal of Products Liability, 1*, 255-263.

Frantz, J. P., Rhoades, T. P., Young, S. L., & Schiller, J. A. (1999). *Potential problems associated with overusing warnings*. Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 43rd Annual Meeting.

Goldhaber, G. M., & deTurck, M. A. (1988). Effects of product warnings on adolescents in an education context. *Product Safety & Liability Reporter*, *11*:949-955.

Karnes, E. W., Leonard, S. D., & Rachwal, G. (1986). Effects of benign experiences on the perception of risk. Proceedings of the Human Factors Society 30th Annual Meeting, 121-125.

Khan FS, Krauss DA, Alper SJ, Droll J, Arndt SR, Lakhiani SD, Cades DM. Do people heed warnings at gas stations? Proceedings, 2nd Annual World Conference of the Society for Industrial and Systems Engineering, pp. 114–117, Las Vegas, NV, November 5–7, 2013. ISBN: 97819384960-1-1.

McCarthy, R. L., Ayres, T. J., Wood, C. T., & Robinson, J. N. (1995). Risk and effectiveness criteria for using on-product warnings. *Ergonomics*, *38*(11):2164-2175.

McCarthy, R. L., Finnegan, J. P., Krumm-Scott, S., & McCarthy, G. E. (1984). *Product information presentation, user behavior, and safety*. Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 28th Annual Meeting.

McGrath, J. M. (1994). Perceptions and responses to warning labels: Implications for products liability litigation. *Journal of Products & Toxics Liability*, *16*(1):19-32.

Miller, J. M., & Lehto, M. R. (2001). *Warnings & safety instructions: annotated and indexed* (4th ed.). Ann Arbor, Mich.: Fuller Technical Publications.

Otsubo, S. M. (1988). *A behavioral study of warning labels for consumer products: Perceived danger and use of pictographs*. Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 33rd Annual Meeting.

Sala J. B., Nichols E. A., Muhammad R., Lakhiani S. D., Rauschenberger R., & C.T., W. (2010). Government, Warnings, Safety Information: A Comparison of Inter-Agency Regulations and Guidance. In Karwowski W. & S. G. (Eds.), *Advances in Human Factors, Ergonomics, and Safety in Manufacturing and Service Industries* (pp. 1047-1056): CRC Press.

Wogalter, M. S. (1989). Effects of Cost and Social Influence on Warning Compliance. *Human Factors*.

Wogalter, M. S., Godfrey, S. S., Fontenelle, G. A., Desaulniers, D. R., Rothstein, P. R., & Laughery, K. R. (1987). Effectiveness of warnings. Human Factors, 29(5):599-612.

Wood, C. T., Sala, J. B., Sanders, K., & Cassidy, P. (2006). *Trends in consumer product warnings found in voluntary standards*. Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 50th Annual Meeting.

Woods, D. D. (2010). *Behind human error*. Ashgate Publishing, Ltd..

Young, S. L., Frantz, J. P., Rhoades, T. P., & Darnell, K. R. (2002). Safety signs & labels: Does compliance with ANSI Z535 increase compliance with warnings? *Professional Safety, September*, 18-23.

Zeitlin, L. R. (1994). *Failure to follow safety instructions: Faulty communication or risky decisions?* Paper presented at the Proceedings of the Human Factors and Ergonomics Society: 39th Annual Meeting.

Shanafelt-Wesley v. Stanley Access Technologies
Project Number: 32-5600
February 5, 2021

## List of Client Supplied Materials

- Sight inspection video from Lexitas
- Site Inspection videos from Aaron Wilkerson
- Various photographs taken at June 9, 2020 inspection
- Inspection form for Power Operated Doors, June 6, 2020
- Owners manuals (Revisions A, B, C, D)
- 2005 Planned Maintenance Agreement
- 2007 Planned Maintenance Agreement
- Letter from Walmart to Stanley, 3/11/2013
- Inspection Documents and photos [Stanley 00105-00139]
- Inspection video [Stanley 00140]
- Plaintiffs Third Amended Complaint
- DHPC Inspection Photos
- Door Control Services Invoice 7/9/2019
- How to Properly Select and Maintain Automatic Doors in Retail Environments - American Association of Automatic Door Manufacturers.pdf
- Stanley Technicians – 14 Point Planned Maintenance and Safety Program – Sliding Door, 6/9/20
- Walmart Compliance Report – Power Operated Door Inspection, 6/9/20
- Interior Surveillance video
- Exterior Surveillance video
- Deposition Transcripts and Exhibits:

    o Blankenship, Courtney
    o Sitter, David, with exhibits
    o Williams, Gary
    o Greer, John, with exhibits
    o Shared Deposition Exhibits, 1-33